<u>**NOT FOR PUBLICATION**</u>

# UNITED  STATES  DISTRICT  COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CAPITAL INVESTMENT FUNDING, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>LANCASTER GROUP, LLC, et al.<br><br>*Defendants*. | Case No. 08cv4714 (EP) (JSA)<br><br>**OPINION** |

**PADIN, District Judge.**

In March 2015, Plaintiff Capital Investment Funding, LLC[1] ("CIF") filed a Third Amended Complaint ("TAC") against several New Jersey-based limited liability companies, including, *inter alia*, LRI II, LLC[2] ("LRI") and Wiltshire Properties, LLC ("Wiltshire"), and several individuals, including James Caserta, Martin Ender, Stuart Katz, and David Lorenzo.  *See* D.E. 362 ("TAC"). The events underlying the TAC stem from a convoluted lending arrangement concocted by CIF and LRI.  The remaining Defendants have filed summary judgment motions pursuant to Federal Rule of Civil Procedure 56.  The Court has considered the parties' submissions and decides the two pending motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78(b).  For the reasons set forth below, the Court will **GRANT** *in part* and will **DENY** *in part* Defendants' respective motions.

---

[1] Originally named Carolina Investment Funding, LLC, but shortly thereafter renamed Capital Investment Funding, LLC.  *See* D.E. 505-15 at 2.

[2] Formerly known as Lancaster Resources, Inc.  TAC ¶ 5.

## I. BACKGROUND

### A. Parties

In November 1998, LRI was created as a New Jersey entity.  LRI's initial shareholders included, L'Abbate, Caserta, Ender, Katz, and Lorenzo,[3] as well as Dyanna Darrigan, Arthur Field, Matthew Glassman, and Elliot Salzman.  TAC ¶ 65; D.E. 505-2 ("K&WP Mat. Facts") ¶ 4; D.E. 521-1 ("CIF Resp. Mat. Facts") ¶ 4; D.E. 505-13 at 7.  LRI's original officers were Field, who was Chairman of the Board; Salzman, who was Vice Chairman of the Board and Chief Executive Officer;[4] L'Abbate, who was President; and Ender, who was Chief Financial Officer.  TAC ¶ 66; CIF Resp. Mat. Facts ¶ 4.

In January 1999, CIF was formed as a subsidiary of LRI under South Carolina law; its initial interim Board of Directors included, Field, Kathryn Taillon,[5] Salzman, and the Individual Defendants.  TAC ¶ 67; K&WP Mat. Facts ¶ 5; CIF Resp. Mat. Facts ¶ 5.  LRI owned 91% interest in CIF until approximately November 2003, when LRI's interest was purchased by Field.  D.E. 527-3 at 93:16-24.  The primary purpose behind CIF's formation was for CIF to raise capital from willing South Carolina investors in exchange for high interest promissory notes, and then to loan that capital to its parent, LRI, for mortgage relending in New Jersey.  K&WP Mat. Facts ¶ 3; CIF Resp. Mat. Facts ¶ 3.  But, ultimately, LRI began relending the capital it borrowed from CIF to affiliated limited liability companies for real estate development projects in New Jersey.  *See* D.E.

---

[3] The following Defendants will be referred to as "Individual Defendants": Caserta, Ender, Katz, and Lorenzo.

[4] In or around April 2000, the LRI shareholders discovered that Salzman had improperly diverted and converted $3.2 million of LRI's funds for personal purposes.  *See generally* D.E. 505-37; *see also* D.E. 505-4 at 144:5-145:12.  Salzman offered to execute a note and security agreement and to repay the pilfered funds over time.  *See* D.E. 505-37; D.E. 505-38.  Salzman was later found to have pilfered additional funds and was stripped of his titled and positions.  *See* D.E. 505-41; D.E. 505-37.

[5] Field's wife.

505-28.   Moreover, at some point, CIF began lending to Monmouth Funding Group, Ltd.[6] ("MFG"), which would then lend that capital to LRI and affiliated limited liability companies.

**B.  Revolving Loan Notes between LRI and CIF**

In 1999, CIF issued $3 million in floating rate notes and $1 million in debentures to South Carolina investors; in 2000, CIF issued $8 million in notes; and in 2001, CIF issued $15 million in notes.  K&WP Mat. Facts ¶ 7; CIF Resp. Mat. Facts ¶ 7.  CIF then loaned most of those funds to LRI for relending on a secured basis in New Jersey.[7]  K&WP Mat. Facts ¶ 8; CIF Resp. Mat. Facts ¶ 8.  But by September 2001, an $18 million revolving loan note executed by LRI in favor of CIF ("Revolving Loan Note") reflected that LRI's repayment obligation to CIF was entirely unsecured, and although LRI envisioned assigning to CIF the mortgages and other security it obtained from its New Jersey borrowers, that vision did not come to fruition.  D.E. 505-21; K&WP Mat. Facts ¶ 8; CIF Resp. Mat. Facts ¶ 8.  Similarly, CIF's prospectus to South Carolina investors did not represent that CIF's interest would be secured.  K&WP Mat. Facts ¶ 8;[8] CIF Resp. Mat. Facts ¶ 8.

In June 2002, the Revolving Loan Note was refinanced and displaced by an updated $21 million revolving loan note ("Updated Revolving Loan Note"), which reflected that CIF's interest

---

[6] Rather than to LRI directly.

[7] *See* D.E. 505-18 at 2-3 (noting CIF's loan was on a secured basis); D.E. 505-19 (noting CIF's loan was secured by LRI's stock).

[8] From CIF's prospectus: "[T]he funds raised by [CIF] from the sale of the Series 2001 Notes shall be lent primarily to LRI as described herein for funding various loans made by them. Whenever possible and prudent, it is the intent of LRI to collateralize such obligations to the Company by assigning the mortgages or other security instruments taken by LRI from its customers or those of its affiliates the Company up to the outstanding balance existing between the Company and LRI." D.E. 505-18.

was secured.  D.E. 505-35 ("This note is secured by Assignment of Mortgages[9] and [LRI's] interest in all Limited Liability Companies[10] that [are] partially owned by the Company.").

In December 2006, the Updated Revolving Loan Note was amended to indicate that the final principal payment would not come due until 2010.  As of that date, LRI owed CIF approximately $17 million on the note.  *See* D.E. 521-2 ("CIF Mat. Facts") ¶ 40; *see also* D.E. 521-22 ("LC Fin. Stmts.") (identifying an approximately $17 million debt owed to CIF, which was "secured by LRI's interest in Wiltshire Properties, LLC and Lancaster Developers, LLC and the members' interest in Wiltshire Properties, LLC.").

In October 2007, LRI and CIF entered into an "Agreement to Repay Indebtedness owed by [LRI] to [CIF]" ("Repayment and Collateral Release Agreement").  *See* D.E.s 505-75, 521-59, 521-60, 521-61, 521-62.  The parties entered into this agreement because LRI's predecessor was merging into a successor entity, LRI II.  K&WP Mat. Facts ¶ 44; CIF Resp. Facts ¶ 44.  Pursuant to the Repayment and Collateral Release Agreement, CIF purportedly released its security interests in all of LRI's collateral so that those interests could be re-asserted against that same collateral after LRI transferred the collateral to its successor entity.  K&WP Mat. Facts ¶ 44; CIF Resp. Facts ¶ 44.

## C.  Other Relevant Corporate Entities

Myriad limited liability companies were formed to develop, build, finance, and sell commercial and residential property in New Jersey on behalf of LRI.  *See* LC Fin. Stmts. at 5.  The capital for these activities came from CIF, which loaned the capital to LRI; LRI then loaned that capital to one of these limited liability companies, Lancaster Developers, LLC ("LD"), which acted

---

[9] 13 third-party mortgages.
[10] *See infra* Section II.C.

as a holding company for LRI's real estate development projects; a subsidiary special purpose limited liability company would then be formed for each real estate development project and would be capitalized by LD. *See* D.E. 510-1 ("CE&L Mat. Facts") ¶¶ 13, 15. One caveat to this sequence of loans, as previously noted, is that an additional limited liability company was inserted into the mix in late 2003: CIF's loans were made to MFG, which would then make loans to LRI and the subsidiary special purpose limited liability companies. *See* D.E. 527-3 at 95:1-5.

The subsidiary special purpose limited liability companies included, *inter alia*, Lancaster Realty Group, LLC, Lancaster Property Services, LLC, Shamrock Building Enterprises, LLC, SkyMark Homes II, LLC, SkyMark Partners, LLC, High Point Holdings, LLC, and High Point Golf Club, LLC ("Lancaster Companies").[11] *See* LC Fin. Stmts. at 5. These companies were affiliated with one another either through parent-subsidiary relationships, common ownership, or common control and many served as the collateral on the Updated Revolving Loan Note. *See id.*

### 1. *Wiltshire Properties, LLC*

In February 2000, LRI shareholders decided to form and capitalize Wiltshire for the purpose of purchasing and developing a property in Ridgefield Park, New Jersey ("Ridgefield Park Property"). CE&L Mat. Facts ¶ 9 (citing D.E. 505-7 at 19:24-20:13, 30:6-9); D.E. 505-23 "Wiltshire Op. Agree." Wiltshire joined with two third-party investors, Brickhouse Partners, LLC ("Brickhouse"), and Pitcairn Ridgefield Park, LLC ("Pitcairn") to fund its Ridgefield Park Property project. D.E. 505-7 at 34:4-21, 38:18-39:1.[12]

---

[11] The limited liability companies listed in the Lancaster Companies' December 2006 combined financial reports were originally parties to this matter.

[12] Wiltshire and Brickhouse also formed Ridgefield Park Office Complex, LLC ("RPOC") with each entity holding 50% interest in RPOC. D.E. 505-22. RPOC and Pitcairn then formed Pitcairn Skymark, LLC ("Pitcairn Skymark"), which ultimately held title to the Ridgefield Park Property. D.E. 505-23. In other words, Wiltshire owned 50% of RPOC, RPOC owned 50% of Pitcairn Skymark, and Pitcairn Skymark owned the Ridgefield Park Property. D.E.s 24-25.

Membership interest in Wiltshire was held as follows: Katz held 48.559%; Salzman held 12.33%; L'Abbate held 11.164%; Caserta held 9.539%; Field held 6.915%; Lorenzo held 3.041%; Glassman and Ender each held 1.875%; and LRI held 1.787%. Wiltshire Op. Agree. at 19. LRI infused $1 million of capital into Wiltshire; this capital originated from CIF. *See id.*; D.E. 505-7 at 30:18-31:16.

In 2001, RPOC issued a capital call to its members, Wiltshire and Brickhouse, in order to raise funds to develop the Ridgefield Park Property. D.E. 505-7 at 277:24-278:16. To meet the capital call, Wiltshire's members, which included the Individual Defendants, ultimately requested a $2.2 million loan from CIF. *Id.* at 32:25-35:7. The transaction was structured as follows: CIF loaned $2.2 million to LRI, with each Wiltshire member serving as guarantor for the portion attributable to his respective membership interest in Wiltshire; LRI loaned the $2.2 million to the Wiltshire members, who used it fund the RPOC capital call. *See id.* at 35:9-20, 36:3-5, 41:7-15, 42:14-18. Wiltshire's members made the required interest payments on the loan until it was satisfied. D.E. 505-5 at 460:8-461:1; D.E. 505-6 at 239:11-249:20.

2. *Lancaster Developers, LLC*

In July 2001, LRI shareholders decided to form and capitalize LD to act as a holding company for future real estate development projects. D.E. 505-6 at 478:12-480:1; D.E. 505-28; *see also* D.E. 505-29. At first, LRI had no ownership interest in LD. CE&L Mat. Facts ¶ 14. Instead, the same individuals who held an interest in LRI also held interests in LD, along with the Lancaster Group, LLC ("LG")[13], which held 7% interest in LD. D.E. 505-29. But because LRI

---

[13] "LG was formed in March 2000 to act as an overarching holding company for all of the Lancaster entities." CE&L Mat. Facts. ¶ 14 n.3 (citing D.E. 505-18). "LG oversees the general activities and policies of LRI And its other affiliates. [LG] does not do business independently, but acts as a holding company for some of the stock in its subsidiaries. The management of these may overlap and/or be comprised of some of the same people, hence [LG] was formed from the directors of the

eventually took over the interests that those individuals held, LRI held a 22% interest in LD by

2002, and 31% interest by 2003.  D.E.s 31-32.  Additionally, by virtue of its interest in LG, LRI

held an additional indirect interest in LD.  D.E. 505-31.

Notably, when LRI[14] was unable to provide sufficient capital to LD, then LD and its

subsidiary companies sought additional traditional bank financing.  CE&L Mat. Facts ¶ 15 (citing

D.E. 505-33; D.E. 505-34).  When LD's subsidiary companies sought traditional bank financing,

they were required to offer first mortgages to those banks.  *Id.* ¶ 16.  Consequently, any interest

CIF had in the subsidiary companies' real estate development projects was subordinate to any

interest the banks had.  *See id.*

### 3. Monmouth Funding Group

In January 2002, CIF's attorney,[15] Scott Pfieffer, concerned about potential violations of

the federal securities law, recommended that CIF extend fewer loans to entities outside of South

Carolina.  K&WP Mat. Facts ¶ 25; D.E. 505-46.  Because CIF's principal business involved

making loans to LRI, a New Jersey entity, Pfieffer recommended that LRI create a subsidiary

based in South Carolina, who could serve as the intermediary between CIF and LRI.  K&WP Mat.

Facts ¶ 25; D.E. 505-46.  As a result, MFG was formed.  K&WP Mat. Facts ¶ 25.  Moving forward,

CIF began lending to MFG (rather than LRI) and MFG would then relend that capital to LRI and

other Lancaster Companies.  *Id.*; D.E. 505-49.  In November 2003, CIF held 100% of MFG's

membership interests.  K&WP Mat. Facts ¶ 28; D.E. 505-54.

---

various affiliates to coordinate the activities of the affiliated companies and promote efficient
administration thereof."  *Id.* (quoting D.E. 505-18).

[14] In part because CIF could not provide the necessary capital to LRI.

[15] And Field's friend.

### D. Procedural History

CIF filed its first Complaint in this action in 2008.  D.E. 1.  Since then the Complaint has been amended twice.  *See* D.E. 3; *see also* TAC.  At its core, CIF's TAC seeks relief for LRI's failure to repay its debt to CIF pursuant to the Updated Revolving Loan Note.  Katz and Wiltshire now move for summary judgment on all eleven counts of the TAC pursuant to Federal Rule of Civil Procedure 56.  D.E. 505-1 ("K&WP Mot.") at 1.  Caserta, Ender, and Lorenzo also move for summary judgment on all eleven counts of the TAC pursuant to Federal Rule of Civil Procedure 56.  D.E. 510-3 ("CE&L Mot.") at 1.  These two motions are now fully-briefed and ripe for review.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" if a reasonable jury could return a verdict for the nonmovant and it is "material" if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment will not be denied based on [the nonmovant's] mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact."  *Ayala v. Assured Lending Corp.*, 804 F. Supp. 2d 273, 278 (citing Fed. R. Civ. P. 56(c)(1)(A); *United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa.*, 2 F.3d 529, 533 (3d Cir. 1993)); *see also Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (noting that nonmovant must present more than a "mere scintilla" of evidence in his favor).  Where the nonmovant bears the burden of persuasion at trial, the movant "may be entitled to summary judgment merely by showing that there is an absence of evidence to support an essential element

of the [nonmovant's] case." *Ayala*, 804 F. Supp. 2d at 279 (citing Fed. R. Civ. P. 56(c)(1)(B); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

At the summary judgment stage, the reviewing court must not weigh the evidence, but rather it must determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  In doing so, the reviewing court must construe reasonable inferences in the light most favorable to the nonmovant. *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002).

## III.   DISCUSSION

### A.  Count I – Breach of Contract

Defendants[16] move for summary judgment on CIF's breach of contract claim for three reasons: (1) Defendants are not parties to the Updated Revolving Loan Note; (2) the Updated Revolving Loan Note is self-executing; and (3) CIF released its security interest in all of LRI's collateral in the October 2007 Repayment and Collateral Release Agreement.  K&WP Mot. at 3-10; CE&L Mot. at 3-10.  CIF responds that summary judgment should be denied for two reasons: (1) factual disputes as to the authenticity of the Repayment and Collateral Release Agreement render it an improper basis for summary judgment; and (2) by virtue of piercing LRI's corporate veil, Defendants may be held individually liable for breach of contract.  *See* D.E. 521 ("CIF Opp'n") at 4-7, 10-12.

A breach of contract claim requires that a plaintiff demonstrate: "[(1)] the existence of a valid contract[; (2) a] breach of that contract[; and (3)] damages." *Cole v. Wells Fargo Bank, N.A.*, 790 F. App'x 460, 465 (3d Cir. 2019) (citing *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App.

---

[16] The only remaining Defendants in this matter are Ender, Caserta, Lorenzo, Katz, and Wiltshire. These Defendants have moved for summary judgment and have all raised similar, if not identical arguments, in support of their motions.  Therefore, references to "Defendants" are to the five remaining Defendants, unless otherwise noted.

Div. 2007)).  CIF claims that Defendants breached the Updated Revolving Loan Note's terms by failing to deliver possession of LRI's collateral assets to CIF and by defaulting on LRI's payment obligation to CIF; consequently, CIF has suffered $18 million plus interest in damages.  TAC ¶¶ 347-354.

First, Defendants assert that they are not parties to the Updated Revolving Loan Note between LRI and CIF, and therefore, they could not have breached the note between LRI and CIF. CIF does not contend that Defendants are parties to the Updated Revolving Loan Note, but instead, that Defendants may be held liable for LRI's breach of that note by virtue of CIF's "piercing the corporate veil" theory.  Because this argument turns on whether LRI's corporate veil should be pierced, this argument will be considered below, *see infra* Section III.B.

Next, Defendants' second and third arguments both depend on the authenticity of the Repayment and Collateral Release Agreement.  In *U.S. v. Am. Radiator & Standard Sanitary Corp.*, the Third Circuit explained that "[t]he ultimate issue of [a document's] authorship and the probative weight to be afforded [to it] is for the jury." 433 F.2d 174, 192 (3d Cir. 1970).  And in *United States v. Mebrtatu*, the Third Circuit noted that "it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic."  543 F. App'x 137, 140 (3d Cir. 2013) (citations omitted).

Here, CIF's most compelling rebuttal to the authenticity of the agreement is that there are five different versions of that agreement and it is unclear which version is the executed agreement. *See* D.E.s 505-75, 521-59, 521-60, 521-61, 521-62.  Most significantly, four of the five versions provide that "all defaults [under the Updated Revolving Loan Note] are hereby waived [by CIF]; and no prior default shall be deemed to exist with respect thereto," but one version does not provide

for this waiver.  *Cf* D.E.s 505-75, 521-59, 521-61, 521-62 *with* 521-60.  Moreover, the time stamps and fax banners differ across all five versions.  *See id.*  Additionally, there are discrepancies in the signatures across the five versions, which raises further doubt as to authenticity.  *Cf* D.E. 505-75 at 5 *with* 521-60 at 4.

Defendants respond that the executed version of the agreement is the one they reference, *see* D.E. 505-75, because it was held by Lowenstein Sandler PC until March 27, 2008, when it was produced in discovery.  *See* D.E. 527 ("K&WP Rep.") at 3-4.  But, viewing the evidence in the light most favorable to CIF, the fact that one version of the agreement omits the default waiver condition, which conflicts with other versions, coupled with the fact that the different versions offer no meaningful date and time from which to deduce which version was executed precludes summary judgment for Defendants on this basis.  *See Munich v. Columbia Basin Helicopter, Inc.*, 2016 U.S. Dist. LEXIS 114520, at *29-30 (D. Or. Aug. 26, 2016) (finding differing versions of a contract created a factual dispute sufficient to preclude summary judgment).

Because a material dispute exists as to CIF's piercing the corporate veil claim, *infra* Section III.B., and Defendants' argument that they are not parties to any contract with CIF depends on whether LRI's corporate veil can be pierced, then it follows that Defendants are not entitled to summary judgment on CIF's breach of contract claim.

## B.  Count XI – Piercing the Corporate Veil

Defendants[17] claim they are entitled to summary judgment on CIF's claim to pierce LRI and the other Lancaster Companies' corporate veils because CIF cannot establish the first element of a piercing the corporate veil claim.  *See* K&WP Mot. at 39-41; *see also* CE&L Mot. at 31-32.

---

[17] References in this subsection to "Defendants" are specific to Caserta, Ender, Katz, and Lorenzo.. *See* TAC ¶¶ 398-407.

CIF responds with a litany of reasons why material factual disputes exist as to the first element, as well as the second element.  *See* CIF Opp'n at 8-10.  The Court agrees that at least one material factual dispute concerning the first element of CIF's claim precludes summary judgment.

"The 'classical' piercing of the corporate veil is an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation." *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999) (citation omitted); *see also Mall at IV Group Props., LLC v. Roberts*, 2005 U.S. Dist. LEXIS 31860, at *7-8 (D.N.J. Dec. 8, 2005) (same).  In New Jersey, courts "begin with the fundamental propositions that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State Dep't of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500 (1983) (citations omitted).

Limited liability "normally will not be abrogated," and the corporate veil will only be pierced "in cases of fraud, injustice, or the like." *Id.*; *see also Joyce v. Super Fresh Food Markets, Inc.*, 815 F.2d 943, 946 (3d Cir. 1987) (same).  Moreover, "[i]t is recognized that the determination of whether there are sufficient grounds for piercing the corporate veil ordinarily should not be disposed of by summary judgment, in view of the complex economic questions often involved, especially if fraud is alleged." *Mall at IV Group Props.*, 2005 U.S. Dist. LEXIS 31860, at *28 (citation omitted); *see also New Jersey Dep't of Envtl. Protection v. Gloucester Envtl. Mgmt. Servs.*, 800 F. Supp. 1210, 1220 (D.N.J. 1992) ("consideration of whether to pierce the corporate veil involves complex issues of law and fact which are not readily amenable to summary judgment.").

A plaintiff seeking to pierce the corporate veil must establish two elements by clear and convincing evidence: (1) "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist[; and (2)] "the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Mall at IV Group Props.*, 2005 U.S. Dist. LEXIS 31860, at *8 (citing 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations*, § 41.30 (perm. Ed., rev. vol. 1999)) (citation omitted).   But "even in the presence of corporate dominance, liability generally is imposed only where the [dominant party] has abused the privilege of incorporation by using the [corporate form] to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron*, 94 N.J. at 500.

Several factors are considered in determining whether the first element has been established, including:

> gross undercapitalization, failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-function of other officers or directors, absence of corporate records, and the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders.

*Mall IV at Props.*, 2005 U.S. Dist. LEXIS 31860, at *9 (citing *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145 (3d Cir. 1988)); *see also Trs. Of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (explaining that these factors are not the exclusive approach to determining whether the first element of a piercing the corporate veil claim).

To establish the second element, "there must be some 'wrong' beyond simply a judgment creditor's inability to collect (otherwise, the corporate veil would be pierced in virtually every

case)."  *Id.* (citing *Sea-Land Services, Inc. v. The Pepper Source*, 941 F.2d 519, 522 (7th Cir. 1991)).  This standard requires a showing that a "fraud, injustice, or the like" has occurred, but does not require proof of common law fraud.  *Id.* at *9-10 (citations omitted).

Defendants' arguments in favor of summary judgment focus on the first element of CIF's claim.  Specifically, they argue that: (1) CIF cannot establish that Defendants were dominant shareholders of LRI because (a) LRI was never managed by Katz, and (b) LRI was first managed by Salzman and then L'Abbate, but not by Caserta, Ender, or Lorenzo;[18] (2) CIF cannot demonstrate an absence of corporate formalities or corporate records because there is abundant evidence of regularly scheduled Board of Directors' meetings, corporate minutes, records of voting, written communications, legal documents and agreements to effect corporate resolutions, maintenance of detailed accounting ledgers, separate and distinct corporate records, a complex corporate structure with a detailed division of duties and responsibilities, and active officers and directors; and (3) evidence of LRI's financial distress is insufficient to demonstrate that LRI was undercapitalized and/or insolvent because (a) there is no evidence that LRI was undercapitalized at the time of formation, and (b) LRI's default on its loan from CIF is not evidence of insolvency.[19]

CIF responds with a litany of purported reasons why material factual disputes as to the first element persist.  Specifically, CIF provides that: (1) the "substantive consolidation" proposed by the debtors in the L'Abbate Bankruptcy[20] demonstrates their corporate sameness; (2) the inability to comprehend the corporate interrelationships between and amongst the Lancaster Companies demonstrates their corporate sameness; (3) the many unresolved intercompany loans demonstrate

---

[18] Although Katz's motion indicates that Lorenzo may have managed LRI at some point.

[19] Defendants reference their insolvency arguments made in relation to Count X for support on this point.

[20] In 2009, L'Abbate, LRI, and other Lancaster Companies filed for Chapter 11 bankruptcy.  *See, e.g.*, D.E. 505-79; D.E. 505-80; D.E. 505-81.

their corporate sameness; (4) the dispute amongst the parties as to whether the Ridgefield Park Property (owned in part by Wiltshire) was one of the Lancaster Companies or a separate entity with common ownership demonstrates their corporate sameness; (5) issues as to whether any of the Lancaster Companies transferred assets to SkyMark Holdings Inc. demonstrate a failure to observe corporate formalities; (6) the documented excessive compensation and benefits taken by the LRI shareholders for themselves from the capital borrowed from CIF demonstrate the siphoning of LRI's funds by Defendants; and (7) LRI's $18 million unpaid debt to CIF demonstrates LRI's undercapitalization and insolvency. *See* CIF Opp'n at 7-9.

The Court is largely not persuaded by CIF's arguments in favor of piercing the corporate veils of LRI and the Lancaster Companies, but finds that at least one existing material factual dispute precludes summary judgment in favor of Defendants at this stage.

Starting with CIF's strongest argument: LRI's insolvency. The Court agrees that evidence of LRI's $18 million default on its obligation to pay CIF, and Defendants' awareness of this default, supports one of the factors considered for piercing LRI's corporate veil. However, "insolvency, without more, is not a factor which can justify piercing a corporate veil." *Lutyk*, 332 F.3d at 195 (citation omitted); *see also id.* at 197 ("Companies commonly become insolvent, then bankrupt; piercing the corporate veil is an exception reserved for extreme situations, rather than the rule."). Thus, without more than evidence of insolvency, piercing the corporate veil is not justified.

Next, CIF's argument that LRI's $18 million unpaid debt to CIF demonstrates undercapitalization misses the mark. The undercapitalization factor differs from the insolvency factor. *Id.* at 196 ("mere insolvency is distinct from under capitalization."). The undercapitalization factor's key inquiry is whether the corporation was adequately capitalized

*when formed*, not whether it subsequently finds itself in financial distress. *See id.* Here, CIF points to no evidence that LRI and/or the Lancaster Companies were undercapitalized when formed. Thus, this factor does not weigh in favor of piercing the corporate veil.

Additionally, CIF's first four contentions as to the first element, provide no support for "such unity and interest" between Defendants and LRI/the Lancaster Companies that they should be treated as having one personality. Instead, these contentions demonstrate an interrelatedness between the different Lancaster Companies. As to CIF's fifth contention, *i.e.*, the Lancaster Companies transferred assets to SkyMark Holdings Inc., this point does nothing to show that Defendants and LRI/the Lancaster Companies were acting as one. *See Holding Corp. v. Mark Line Indus.,* LLC, 376 F. Supp.3d 417, 427 (D.N.J. 2019). Thus, these contentions do not point to any material factual dispute. Moreover, CIF fails to address the evidence Defendants provide showing the existence of corporate formalities, *i.e.*, corporate minutes and records, which counsels against piercing the corporate veil. *See*, *e.g.*, D.E. 521-26.

Finally, CIF's most availing argument, particularly when coupled with LRI's potential insolvency: Defendants took excessive compensation and benefits for themselves from the capital LRI borrowed from CIF demonstrates that Defendants siphoned funds. *See Lutyk,* 332 F.3d at 195 ("the District Court's findings with respect to American's insolvency are strong evidence to support the Court's conclusion that Lutyk was siphoning funds."). The most favorable record evidence supporting CIF's argument is the following: in 2004, L'Abbate[21] earned $431,250.13 with a $700 per month auto allowance, Lorenzo earned $216,146.04 with a $792 per month auto allowance, while Caserta, Ender, and Katz each earned $25,000, D.E. 521-27; and the series of

---

[21] Who is no longer a Defendant.

communications, whereby Caserta and Katz raise concerns that funds were being mismanaged, *see* D.E.s 521-29, 521-30, 521-31 at 198:12-199:6, 521-32.

Caserta, Ender, and Katz's respective $25,000 salaries do not, on their face, appear "excessive," such that this fact alone would demonstrate a siphoning of funds. *See On Command Video Corp. v. Roti*, 705 F.3d 267, 275 (7th Cir. 2013) (holding that the corporate veil could not be pierced based on corporate officer's receipt of salary without some indication that the salary was excessive); *see also Int'l Union, UAW v. Aguirre*, 410 F.3d 297, 303 (6th Cir. 2005) (noting that plaintiffs' attempt to pierce the corporate veil based on their allegation that funds were improperly siphoned to pay defendants excessive salaries and distributions was properly rejected by the district court, which concluded that plaintiffs had not established "a genuine issue of material fact as to whether [defendants] should have made more prudent or conservative decisions regarding salaries and distributions."). But L'Abbate and Lorenzo's six-figure salaries, taken together with the series of communications discussing the mismanagement of LRI's funds[22] at a time when LRI was on the brink of default, are enough to create a material factual dispute as to whether Defendants were siphoning funds. *See Bell Container Corp. v. Palagonia Bakery Co.*, 2022 U.S. Dist. LEXIS 117615, at *16-17 (D.N.J. July 5, 2022) (denying summary judgment on piercing the corporate veil claim due to disputes concerning whether funds were transferred from

---

[22] *See, e.g.*, D.E. 521-29 ("Stu: I believe you and I have the same goal: a company run on SOUND FISCAL PRINCIPLES…period[…] While you and I will not agree on everything, we must, absolutely must, stay united and try to set LD on the proper course i.e., if it isn't too late!!"); D.E. 521-32 (Katz accusing L'Abbate, stating: "I am returning these checks as I feel you [L'Abbate] are abrogating your fiduciary responsibilities to our various corporations by spending money we do not have. I do not wish to be involved in the squandering of badly needed monies. Your actions have already needlessly forced the sale of one of our properties to a fellow Board member in order to cover a short fall in cash flow."); D.E. 521-66 (Caserta accusing Katz of cheating LRI, stating: "Stu: After all, you [Katz] cheated LRI, and that now affects me…as it turns out, it does affect me now because you did not give 'just compensation' for LRI's percentages in Wiltshire. Had you done so, LRI would have more assets than it currently has; ergo, money falls to me.").

the company to individuals for personal rather than corporate purposes); *Pricaspian Dev. Corp. v. Martucci*, 2014 U.S. Dist. LEXIS 2755, at *8-9 (D.N.J. Jan. 9, 2014) (denying summary judgment on piercing the corporate veil claim despite parties' lacking evidence and noting that "this district is hesitant to grant summary judgment on piercing the corporate veil claims); *Ballard v. Combis*, 2020 U.S. Dist. LEXIS 264768, at *25-27 (D.S.C. Jan. 3, 2020) (finding evidence of siphoning funds where shareholder treated company as "his personal piggy bank" by "continuously taking from the company and only leaving enough in its account for it to function.").

Given the Court's finding that a material factual dispute exists as to the first element of CIF's claim to pierce the corporate veils of LRI and the Lancaster Companies, the Court need not reach the second element of this claim in full.  But the Court does note that the series of communications concerning the mismanagement of funds exchanged between Defendants appear to create a material factual dispute as to the second element as well.

Accordingly, Defendants are not entitled to summary judgment as to CIF's claim to pierce the corporate veils of LRI and the Lancaster Companies.

## C. Count II – Common Law Fraud; Count III – Equitable Fraud; Count IV – Fraudulent Inducement; Count V – Intentional Misrepresentation; Count VI – Negligent Misrepresentation

Defendants move for summary judgment on CIF's fraud and misrepresentation claims, Counts II through VI, asserting that these claims all require a showing of virtually the same legal elements, and thus, may all be dismissed based on common shortcomings.  CE&L Mot. at 10; K&WP Mot. at 10.  CIF responds that summary judgment is inappropriate because substantial factual disputes persist.  CIF Opp'n at 12.  The Court agrees with Defendants.

Counts II, IV, and V assert a common law fraud claim, a claim for fraudulent inducement, and an intentional misrepresentation claim, respectively, which all require that a plaintiff

demonstrate: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Sams v. Pinnacle Treatment Ctrs., Inc.*, 2021 U.S. Dist. LEXIS 95895, at *18 (D.N.J. May 20, 2021) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997) (internal citations omitted)); *see also Iglesia v. Tootsie Roll Indus., LLC*, 2021 U.S. Dist. LEXIS 200269, at *26-27) (D.N.J. Oct. 18, 2021) (noting that fraud and intentional misrepresentation claims require the same elements).

Count III asserts an equitable fraud claim, which is nearly identical to a common law fraud claim, except for the following distinctions: common law fraud "requires proof of intent while equitable fraud does not…Further, a plaintiff that asserts equitable fraud is not entitled to recover monetary damages; he [] may recover only in equity." *Sams*, 2021 U.S. Dist. LEXIS 95895, at *18 (quoting *Dutton Rd. Assocs. LP v. Sunray Solar, Inc.*, 2011 U.S. Dist. LEXIS 39798, at *5-6 (D.N.J. Apr. 12, 2011) (citations omitted)).

Count VI asserts a negligent misrepresentation claim, which requires that a plaintiff demonstrate: "(1) an incorrect statement[;] (2) negligently made[;] (3) upon which [the] plaintiff relied[;] and (4) resulted in economic loss or injury as a consequence of that reliance." *Iglesia*, 2021 U.S. Dist. LEXIS 200269, at *27 (citing *Mason v. Coca-Cola*, 774 F. Supp. 2d 699, 704 (D.N.J. 2011) (internal citation omitted)). A negligent misrepresentation claim and a common law fraud claim are similar, except that the former does not require a showing of intent. *N.Y. Pipeline Mech. Contractors, LLC v. Sabema Plumbing & Heating Co.*, 2012 U.S. Dist. LEXIS 8152, at *12 (D.N.J. Jan. 24, 2012) (citation omitted). Additionally, "any tort of negligence[, such as negligent misrepresentation] 'requires the plaintiff to prove that the [defendant] breached a duty of care owed

19

[to the] plaintiff[.]'" *Id.* (quoting *Highlands Ins. Co. v. Hobbs Group*, 373 F.3d 347, 351 (3d Cir. 2004)).

CIF's fraud and misrepresentation claims, Counts II through VI, are largely premised on an assertion that Defendants fraudulently and/or negligently misrepresented that LRI would secure collateral interests for CIF in connection with the Updated Revolving Loan Note between CIF and LRI, *i.e.*, the Updated Revolving Loan Note. *See* TAC ¶¶ 355-71; *see also* CIF Opp'n at 12. These claims are also premised on the following alleged omissions: (1) Defendants, as LRI's directors, concealed the circumstances of Salzman's improprieties from CIF; (2) Defendants misrepresented the value of the equity in the development properties (the special purpose limited liability companies) to CIF; (3) Defendants concealed the role of intermediary lenders, like MFG, from CIF; (4) Defendants, as LRI's directors, concealed LRI's default of the Updated Revolving Loan Note from CIF; (5) Katz concealed the true basis behind CIF's purchase of two condominium units from LRI; and (6) Defendants concealed from CIF the Merger Transaction and the L'Abbate Separation Agreement.

First, Defendants contend that they are entitled to summary judgment as to CIF's equitable fraud claim, Count III, because equitable fraud is only proper where the principal relief sought is equitable. CE&L Mot. at 12; K&WP Mot. at 12-13. CIF makes no attempt to rebut Defendants' contention. "Depending on the remedy sought, an action for fraud may be either legal or equitable in nature." *Smith v. CitiMortgage, Inc.*, 2015 U.S. Dist. LEXIS 17193, at *21 (D.N.J. Dec. 22, 2015) (citation omitted). And as noted above, monetary damages may not be recovered on this type of claim; recovery must be "in equity." *Dutton Rd.*, 2011 U.S. Dist. LEXIS 39798, at *5-6 (citation omitted). Here, CIF's requested relief is monetary, and not "in equity;" for example, CIF requests "compensatory damages in the amount of all outstanding principal and interest plus costs

of collection and fees[,]" and "all costs incurred as a result of the aforementioned equitable fraud[.]"  *See* TAC ¶ 362.  Therefore, CIF's equitable fraud claim cannot proceed.

Second, Defendants argue that they are entitled to summary judgment as to CIF's common law fraud claim, fraudulent inducement claim, intentional misrepresentation claim, and negligent misrepresentation claim, Counts II, IV, V, and VI, respectively, for several reasons: (1) CIF has not identified any specific affirmative misrepresentations made directly by Defendants; (2) Defendants had no duty to disclose to CIF; (3) CIF was aware of all relevant information, which means that it could not have relied on any alleged misrepresentations and/or omissions from Defendants; (4) the economic loss doctrine precludes any fraud and misrepresentation claims, given that these claims are an attempt to convert a breach of contract claim into tort claims; and (5) the Repayment and Collateral Release Agreement moots CIF's fraud and misrepresentation claims.  *See* CE&L Mot. at 10-22; *see also* K&WP Mot. at 10-28.  CIF responds only to some of Defendants' arguments, *i.e.*, CIF asserts Defendants had a duty to disclose to CIF because they had a "special relationship."  *See* CIF Opp'n at 12-15.  Significantly, CIF fails to respond to Defendants' argument concerning CIF's inability to establish that it reasonably relied on any of the alleged misrepresentations and/or omissions.  Reliance by CIF is an element of Counts II, IV, V, and VI, and Defendants have demonstrated that CIF will not be able to satisfy this element.

Specifically, CIF asserts that Defendants misrepresented to CIF that sufficient collateral existed to secure LRI's obligation under the Updated Revolving Loan Note, as well as misrepresentations concerning the specific real estate projects that made up the collateral.  CIF Opp'n at 12-13.  But as Defendants point out, CIF does not identify or tie Defendants to any affirmative misrepresentations made to CIF.  *See generally* CIF Mat. Facts (devoid of any affirmative misrepresentations made by Defendants).  Without more than bald assertions, CIF

cannot defeat Defendants' respective summary judgment motions.  Moreover, Defendants identify

two of CIF's internal documents, which note that CIF would rely on the appraisals of third-party

appraisers in ascertaining the property values of the relevant collateral, as well as that there was

no assurance that the secured collateral would be sufficient to cover LRI's debt.  *See* D.E. 55-104

at 3 (October 2007 report to CIF noteholders stating: "There is also no assurance the collateral

secured would be sufficient to cover the debt to CIF if immediate liquidation were required for

any reason. However, [CIF] conducted an inspection tour of the collateral in August, 2007, to

verify the existence thereof and the progress of construction…The property values listed therein

were provided based upon appraisals conducted by independent appraisers[.]"); *see also* D.E. 505-

16 at 4 (CIF 2003 prospectus to potential noteholders stating: "LRI and/or [CIF], or other re-lender,

shall make such loans as it deems prudent and accept such collateral as may be appropriate and

applicable under the circumstances of the loan and shall rely in good faith on the opinion of

independent experts as to the value thereof…").  Thus, CIF's own internal documents indicate that

CIF did not reasonably rely on any affirmative misrepresentations made (if there were any) by

Defendants.

Furthermore, Defendants have shown that CIF cannot meet the reliance element of the

fraud and misrepresentation claims based on CIF's claim that Defendants concealed material

information from CIF.  While silence may be considered fraudulent concealment if there is a duty

to disclose, no such duty exists in a business transaction if there is no fiduciary relationship

between the parties.  *New Jersey Economic Development Authority v. Pavonia Restaurant, Inc.*,

319 N.J. Super. 435, 446 (App. Div. 1998) (citation omitted).  Similarly, "where information is

equally available to both parties, neither party has a duty to disclose that information to the other."

*Id.* (citation omitted).  CIF points to six purported concealments by Defendants (listed above), but

then fails to respond to Defendants' position that CIF could not have reasonably relied on the purported concealments because CIF's manager, Arthur Field, was aware of the same information that Defendants had.  CE&L Mot. at 17-24; K&WP Mot. at 15-20.

In contrast, Defendants identify record evidence supporting their position.  *See, e.g.*, D.E. 505-6 at 379:6-23, 215:19-216:19, 600:12-19; D.E. 505-42; D.E. 505-43; D.E. 505-44; D.E. 505-48.  For example, the record demonstrates that Field was present during the board meetings at which Salzman's improprieties were discussed, voted in favor of resolutions related to resolving those improprieties, and drafted relevant settlement agreements.  *See* D.E. 505-42; D.E. 505-43; D.E. 505-44.  Moreover, while CIF claims it did not know about LRI's default, and that Defendants concealed that fact, the record shows CIF was aware that LRI was not timely repaying the principal on the Updated Revolving Loan Note in 2006.  *See* D.E. 505-6 at 215:19-216:19, 600:12-19.  Thus, Defendants have demonstrated they had no duty to disclose to CIF.

Based on the foregoing, Defendants have shown that CIF will not be able to carry its burden on the reliance element necessary for its common law fraud, fraudulent inducement, intentional misrepresentation, and negligent misrepresentation claims, Counts II, IV, V, and VI, respectively.  Defendants have also shown that CIF's equitable fraud claim, Count III, seeks an inappropriate remedy.  Accordingly, Defendants are entitled to summary judgment on Counts II through VI.

### D.  Count VII – Unjust Enrichment

Defendants move for summary judgment on CIF's unjust enrichment claim for two reasons: (1) CIF cannot establish a direct relationship between CIF and Defendants because, at best, CIF entered into a direct contractual relationship with LRI, not LRI's individual shareholders or directors, and CIF conferred a benefit in the form of the loan proceeds directly to LRI; (2) with the exception of the $2.2 million loan to fund a capital call to Wiltshire, CIF does not allege that

any Defendants received any of the loan proceeds, and therefore they never obtained a benefit conferred by CIF.  *See* CE&L Mot. at 22-24; K&WP Mot. at 28-31.  CIF responds: (1) Defendants had a "special" relationship with CIF; and (2) there is a "significant" factual dispute related to the $2.2 million loan because the loan was not properly documented; and (3) other benefits were unjustly retained by Defendants at CIF's expense, such as compensation received in the form of salaries.  CIF Opp'n at 16-17.  CIF's arguments are unpersuasive because it cannot show that it conferred a direct benefit on Defendants beyond the loans made to LRI.

A claim for unjust enrichment requires that a plaintiff demonstrate "both that [the] defendant received a benefit and that retention of that benefit without payment would be unjust." *A.I. Credit Consumer Disc. Co. v. Premiere Foods, Inc.*, 2007 U.S. Dist. LEXIS 81737, at *32 (D.N.J. Nov. 5, 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994) (citations omitted)).  "The unjust enrichment doctrine requires that [the] plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on [the] defendant and that the failure of remuneration enriched [the] defendant beyond its contractual rights."  *Id.* (citations and internal quotation marks omitted).

Here, CIF claims that Defendants were unjustly enriched by receiving the benefits of the loans made by CIF.  TAC ¶ 377.  But those loans were made to LRI, not Defendants.  The benefits conferred by those loans were, therefore, conferred on LRI, not Defendants.  There could be no expectation that Defendants would provide CIF with remuneration under the Updated Revolving Loan Note.  Furthermore, CIF's contention that Defendants had a "special" relationship with CIF is unavailing because, regardless, of whatever relationship CIF has in mind, CIF's relationship was with LRI (contractual), and CIF cannot demonstrate that it had a direct relationship with Defendants. *See Norcom Research, LLC v. Net2Phone Global Servs., LLC*, 2021 U.S. Dist. LEXIS

57977, at *19-20 (D.N.J. Mar. 26, 2021) (noting that an unjust enrichment claim is an equitable remedy, known as a "quasi contract" claim, which is asserted when there has been a failure of remuneration that enriched the defendant "beyond its contractual rights").

Moreover, the alleged "significant" factual dispute concerning Wiltshire's call for $2.2 million from its shareholders, which included Defendants, is not a material factual dispute and is irrelevant to CIF's unjust enrichment claim. Specifically, CIF loaned LRI $2.2 million, which then infused that capital into Wiltshire on behalf of Defendants, the individual shareholders. *See* D.E. 505-7 at 35:9-36:5, 41:7-15, 42:14-18. Again, CIF did not confer a direct benefit on Defendants with the expectation of remuneration from Defendants. Instead, CIF conferred a direct benefit on LRI with the expectation of remuneration from LRI. Regardless, Defendants satisfied their $2.2 million debt to LRI. *See, e.g.*, D.E. 527-3 at 240:23-243:7. Thus, CIF cannot maintain an unjust enrichment claim against Defendants.

Accordingly, Defendants are entitled to summary judgment as to CIF's unjust enrichment claim.

### E. Count VIII – Negligently Causing Economic Harm

Defendants move for summary judgment on CIF's negligence claim, Count VIII, for two reasons: (1) Defendants did not owe a duty of care to CIF, seeing as an officer of debtor corporation does not owe such a duty to a creditor in the absence of the debtor's insolvency; and (2) CIF's claim is barred by the economic loss doctrine because the only duty imposed on the parties derives from a contractual relationship. CE&L Mot. at 24-25; K&WP Mot. at 31-32. CIF responds: (1) Defendants owed a duty of care to CIF because LRI was insolvent; and (2) the economic loss doctrine does not apply because: (a) this is not a products liability case nor does it arise out of a contract for services or mixed goods/services; and (b) even if the doctrine applies to promissory

notes and/or credit agreements, CIF's negligence claim is independent of such notes and/or agreements. *See* CIF Opp'n at 14, 16, 18-21.  The Court agrees with Defendants that the economic loss doctrine bars CIF's negligence claim.

A negligence claim requires that a plaintiff establish: "(1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (citation omitted).  The section of CIF's TAC outlining its negligence claim, *see* TAC ¶¶ 379-81, does not detail what specific actions it attributes to Defendants for purposes of CIF's negligence claim.  The Court can only glean, based on the preceding 378 paragraphs, that CIF is asserting that Defendants acted negligently in relation to LRI's performance on the promissory notes and credit agreements.

Whether Defendants owed a duty of care to CIF is an issue of material fact, *infra* Section III.G., therefore, the Court will not grant summary judgment to Defendants as to CIF's negligence claim, Count VIII, on that basis.  But the Court addresses Defendants' second argument concerning the economic loss doctrine.

The economic loss doctrine "provides that, when parties have entered into a contract, contract law rather than tort law governs disputes within the subject matter of the contract, and a party cannot use a tort claim to bypass the legal relationship created by the contract."  *Cudjoe v. Ventures Trust 2013I-H-R by MCM Capital Partners, LLP*, 2019 U.S. Dist. LEXIS 30836, at *9 (D.N.J. Feb. 26, 2019) (citing *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297 (N.J. 2002) (internal citations omitted); *see also Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002)).  Here, CIF's contention that the economic loss doctrine does not apply where the contract is a promissory note and/or credit agreement is contrary to case law, which

provides that the doctrine applies to promissory notes and related agreements.  For example, in *Perez v. JPMorgan Chase Bank, N.A.*, the district court found that the plaintiff's tort claims were barred by the economic loss doctrine because they were "rooted in the contractual relationship between the parties based upon the Note and Mortgage."  2016 U.S. Dist. LEXIS 24689, at *19-20 (D.N.J. Feb. 29, 2016); *see also Coleman v. Deutsche Bank Nat. Trust Co.*, 2015 U.S. Dist. LEXIS 61875, at *8 (D.N.J. May 12, 2015) (concluding that because the plaintiff's claims were "based on a contractual relationship, *i.e.*, the Note and Mortgage, [the p]laintiff's tort claims against [the d]efendants are barred as a matter of law by the economic loss doctrine.").  Thus, the economic loss doctrine bars CIF's negligence claim if it is rooted in the contractual relationship created by the promissory notes and credit agreements between CIF and LRI.

The Court finds that CIF's negligence claim is rooted in the contractual relationship created by the promissory notes and credit agreements between CIF and LRI.  This is made clear by the remedy CIF seeks on its negligence *and* breach of contract claims: "compensatory damages in the amount of all outstanding principal and interest plus costs of collection and fees…"  *See* TAC ¶¶ 354(a), 381(a).  The outstanding principal CIF seeks is that owing on the Updated Revolving Loan Note.  Thus, because CIF's negligence claim seeks relief that flows from a contract, the economic loss doctrine bars this claim.

Accordingly, Defendants are entitled to summary judgment as to CIF's negligence claim, Count VIII.

### F.  Count IX – Conversion

Defendants move for summary judgment on CIF's conversion claim, Count IX, asserting that this tort is inapplicable to a debtor-creditor relationship.  K&WP Mot. at 32-33; CE&L Mot. at 25.   CIF responds that Defendants miscast their relationship with CIF, and that summary

judgment is improper, because: (1) "the complicated web of business interests presented by the Lancaster Companies, and their relationship to CIF," is not that a conventional debtor-creditor relationship; and (2) the previous relationship Defendants had with CIF as either board members and/or shareholders is significant, in that, when the debt at issue was incurred, LRI owned 90% of CIF.  CIF Opp'n at 16-17.  CIF's arguments are red herrings that do not address Defendants' properly asserted position that conversion is inapplicable to a debtor-creditor relationship.  *See, e.g.*, *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 552 (App. Div. 1997) ("The virtually unanimous rule is that creditor-debtor relationships rarely give rise to a fiduciary duty.").

"'The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and the exclusion of the owner's right in that property.'"  *Cevdet Aksut Ve Ogullari Koll. Sti v. Cavusoglu*, 2015 U.S. Dist. LEXIS 90859, at *27 (D.N.J. July 14, 2015) (quoting *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444456 (App. Div. 2009)).  "An action for conversion does not lie where there is a debtor-creditor relationship between the parties." *Id.* (citing *Advanced Enterprise Recycling, Inc. v. Bercaw*, 376 N.J. Super. 153, 161 (App. Div. 2005)).  "'Where there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of funds representing the indebtedness will not lie against the debtor.'"  *Id.* at *27-28 (citing *Bercaw*, 376 N.J. Super. At 16).

Here, CIF's conversion claim alleges that Defendants deprived CIF of its rights to the collateral interest in the properties held by the Lancaster Companies.  *See* TAC ¶¶ 382-385.  What CIF ignores, and its responsive arguments do not dispel, is that any relationship between Defendants and CIF would be that of a debtor vis-à-vis a creditor.  This debtor-creditor relationship is evidenced by the remedy sought by CIF on its conversion claim because CIF merely seeks to

recoup the debt owed to it: "compensatory damages in the amount of all outstanding principal and interest[.]"  TAC ¶ 385(a).

Accordingly, Defendants are entitled to summary judgment as to CIF's conversion claim.

### G. Count X – Breach of Fiduciary Duties

Defendants[23] move for summary judgment on CIF's claim for breach of fiduciary duties, Count X, for three reasons: (1) Defendants did not owe fiduciary duties to CIF; (2) the Repayment and Collateral Release Agreement, which purportedly released LRI's collateral, moots CIF's claim; and (3) if any fiduciary duties existed, LRI and/or Defendants did not breach those duties because they engaged in good faith, and took corrective measures or resolutions in the best interest of the company and its creditors.  K&WP Mot. at 26-29; CE&L Mot. at 33-37.  CIF responds: (1) Defendants owed fiduciary duties to CIF because (a) as directors of an insolvent corporation, LRI, they owe fiduciary duties to that corporation's creditor, CIF, and (b) as initial interim directors of CIF's Board of Directors and as original CIF shareholders, they owe fiduciary duties to CIF; (2) the Repayment and Collateral Release Agreement was arguably forged; and (3) Defendants breached their fiduciary duties to CIF when they were aware of LRI's insolvency, yet failed to discuss how to protect CIF.  CIF Opp'n at 17-21.

A breach of fiduciary duty claim requires that a plaintiff demonstrate: "(1) the existence of a fiduciary duty[;] (2) the breach of that duty by the defendant[;] and (3) resulting damages." *Equiom (Isle of Man) Ltd. v. Jacobs*, 2021 US. Dist. LEXIS 17197, at *9-10 (Jan. 29, 2021) (citation omitted).  Typically, "directors owe no [fiduciary] duty to corporate creditors."  *VFB L.L.C. v. Campbell Soup Co.*, 482 F.3d 624, 635-36 (3d Cir. 2007).  But, under New Jersey law,

---

[23] References in this subsection to "Defendants" are specific to Caserta, Ender, Katz, and Lorenzo. *See* TAC ¶¶ 386-397.

"'[o]nce a corporation becomes insolvent [] the directors assume a fiduciary or "quasi-trust" duty to the corporation's creditors' where the directors cannot prefer one creditor over another.".  *See Equiom*, 2021 U.S. Dist. LEXIS 17197, at *10 (quoting *Bd of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173 (3d Cir. 2002)) (citation omitted); *In re Stevens*, 476 F. Supp. 147, 153 n.5 (D.N.J. 1979) (noting that in this "quasi-trust relationship, officers and directors cannot prefer one creditor over another, and they have a special duty not to prefer themselves.") (internal quotation marks omitted).

Defendants contend that CIF has not established that they owed fiduciary duties to CIF. Specifically, Defendants claim that because LRI's insolvency is a predicate to any fiduciary duties owed to CIF, then CIF was required to submit expert testimony on the issue of LRI's insolvency during the relevant period.  CIF responds that it need not provide expert testimony as to LRI's insolvency, because the record supports that LRI was insolvent, and that Defendants were aware of this fact.  For example, in April 2007, via a written consent signed by Ender, Lorenzo, and Katz, on behalf of LRI's shareholders, LRI acknowledges that it "is in default to [CIF], with respect to a loan with an outstanding principal balance of over $17 million and is in default on a loan with a principal balance of over $1 million to a subsidiary of CIF. [LRI] has no liquid assets to make any payment to CIF or its subsidiary, and no credit[.]"  D.E. 505-71 at 1, 4.  Moreover, in an April 2007 email to Defendants, L'Abbate states: "[a]s you know, [LD, LG, SkyMark Associates, LLC, and LRI] are in great financial distress. [LRI] is in default to [CIF] and its subsidiary with respect to loans in excess of $18 million, and many of our subsidiaries are in default or about to go into default on obligations to other personal and financial institutions."  D.E. 505-68 at 1.

In New Jersey, "a corporation is insolvent when there is a general inability to meet pecuniary liabilities as they mature by means of either available assets or an honest use of credit."

*Auburn Button Works v. Perryman Elec. Co.*, 107 N.J. Eq. 554, 556 (N.J. Chancery Ct. 1931). Here, CIF has provided evidence that LRI was unable to meet its pecuniary liabilities to CIF by virtue of LRI's default on its obligation to pay CIF pursuant to the Updated Revolving Loan Note. Additionally, that same record evidence demonstrates that Defendants were aware of LRI's inability to meet its pecuniary liabilities to CIF in April 2007.  Moreover, Defendants' assertion that CIF was required to prove insolvency via an expert is a stretch because "the absence of an expert is not fatal to [Plaintiff's] case…it simply makes [the Court's] job more difficult."  *See Prosser v. Springel*, 2013 U.S. Dist. LEXIS 142911, at *42-43 (D.V.I. Sept. 27, 2013); *see also Maples v. Klein*, 2020 U.S. Dist. LIS 53629, at *12 (N.D. Ala. Mar. 27, 2020) ("Several courts have held that expert testimony is the usual, but not exclusive, means of determining insolvency.") (citations omitted).  Therefore, the Court finds that CIF has at a minimum demonstrated a material dispute as to whether LRI was insolvent, and, in turn, whether Defendants owed CIF, its creditor, any fiduciary duties.  *See In re Lemington Home for the Aged*, 718 F.3d 675, 676 (3d Cir. 2015) (noting that "the directors of an insolvent corporation [must] consider, as fiduciaries, the interests of the corporation's creditors who, by definition, are owed more than the corporation has the wallet to repay.") (citation omitted).

Accordingly, because a material factual dispute exists as to CIF's breach of fiduciary duties claim, summary judgment in favor of Defendants is precluded, and the Court need not address Defendants' additional arguments addressing this claim.

## IV.    CONCLUSION

For the reasons set forth above, the Court will **GRANT** *in part* and **DENY** *in part* Defendants' respective summary judgment motions.  Accordingly, only Count I – Breach of

Contract, Count X – Breach of Fiduciary Duties, and Count XI – Piercing the Corporate Veil remain.  An appropriate Order accompanies this Opinion.

Dated: March 30, 2023

Evelyn Padin, U.S.D.J.